## AFFIDAVIT IN SUPPORT OF A SEARCH AND SEIZURE WARRANT

I, SAMUEL GLYNN, a Special Agent with the Drug Enforcement Administration, being duly sworn according to law, hereby state that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief:

### INTRODUCTION

1.      This affidavit is submitted in support of an application for a warrant to search the residence of 1275 S. Birch St. #203, Denver, Colorado 80246 (described more fully in **Attachment A** hereto as the "**SUBJECT PREMISES**").

2.      As set forth herein, there is probable cause to believe that Kole Douglas **MILNER** and other unknown individuals, have committed, are committing, and will commit violations of federal laws including 21 U.S.C. § 841 (manufacture, distribution, and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy), and 18 U.S.C. § 1956 (money laundering) (the "**SUBJECT OFFENSES**"), namely involving the cultivation, manufacture, and distribution of psilocybin mushrooms, a Schedule I Controlled Substance, and that located in or on the **SUBJECT PREMISES** are items constituting evidence or instrumentalities (described more fully in **Attachment B** hereto) of said violations of federal law.

### AGENT BACKGROUND

3.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since November, 2016.  I have been assigned to the DEA Denver, Colorado Field Division Office Enforcement Group 1 since April 1, 2017.  Prior to starting at the DEA, I was a Police Officer with the Arvada Police Department for over 5 years.

4.      As a DEA Special Agent, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am authorized by law to conduct investigations and make arrests for offenses in Title 21, United States Code, Section 878.  I am a "Federal Law Enforcement Officer" within the meaning of FED.R.CRIM.P. 41(a)(2)(C).

5.      As part of my training, I have completed DEA's 18 week Basic Agent Training Course at the DEA Academy in Quantico, Virginia, which included training on surveillance and undercover techniques, tactical operations, confidential source management, probable cause from sources, interview and interrogation, drug identification, drug field testing, clandestine laboratories and hazardous materials, asset forfeiture, controlled substances law, search and seizure law, drug conspiracy law, electronic surveillance law, money laundering and bulk currency law, and extraterritorial law.  During my tenure with DEA, I have assisted in investigations that targeted suppliers, buyers, and couriers of narcotics. I have also participated in surveillance operations, in which I have learned the methods of operation of drug trafficking organizations. Furthermore, I receive training on a daily basis working on drug investigations for DEA in the Denver, Colorado Division Office.

6.      As part of my experience and training, I routinely communicate with other law enforcement personnel who specialize in the area of illegal drug trafficking and documentation and the detection of proceeds from drug trafficking. I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

7.      I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

a.   That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of drugs, money, and/or other drug related assets are stored. Therefore, one or more locations are often used to store lesser amounts of drugs, money, and/or drug related assets, and additional locations are used to meet customers.

b.   That persons involved in large scale drug trafficking conceal, in various locations, drug paraphernalia, amounts of jewelry, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities.

c.   That members of these organizations routinely utilize communication facilities including cellular telephones, satellite telephones, encryption capable UHF transceivers/two-way radios, facsimile machines, electronic mail, and text messaging to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection.  Based on training and experience, I know that narcotics traffickers commonly use prepaid, or "throw away," cellular telephones to avoid detection and elude law enforcement, and said traffickers also change these devices frequently to avoid detection by law enforcement officials.

d.   That drug dealers use telephones, portable cellular telephones, pagers, and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

e.   That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, pagers, computers, and external hard drives.  I further know, based on my training and experience, as well

2

as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such documents and devices, in order to maintain a record of accounts, income, expenditures, assets, and drug-related debts.

f.   I know, based on training and experience, as well as from information relayed to me during the course of my official duties, that narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking. Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

g.   That drug traffickers have maintained at their locations, including the residences where they live, in their vehicles, and in off site "stash" locations: money, ledgers, narcotic supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed and that drug traffickers sometimes store drugs, their proceeds, and documents relating to drug activities at storage facilities in an effort to thwart law enforcement efforts to find them.

h.   That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, travelers checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes. In order to do this, they may attempt to secrete, transfer, and conceal the money in several ways, including, but not limited to, the following: (1) placing assets in names other than their own to avoid detection while maintaining control of the assets, (2) laundering the money through what appears to be a legitimate business, (3) hiding the money in their homes, safes, and safety deposit boxes, (4) using the money to buy assets which are hard to trace, or (5) transferring assets into what appear to be legitimate amounts, to other individuals. Records of these transactions including banking records are often found in drug dealers' residences. In addition, as described in this affidavit, individuals who sell drugs for bitcoin often use bitcoin exchange sites to convert their proceeds to fiat currency, or use other websites to convert their proceeds to gift cards that can be spent on goods and services.

3

i.   That drug traffickers often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement agencies; and that, even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase and/or control of those assets while continuing to use those assets and exercise dominion and control over them.

j.   That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles.

k.   That drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product; and that these traffickers often maintain these photographs at their premises, within vehicles, or as stored electronic images.

l.   That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations.

m.   That drug dealers commonly have in their possession, that is on their persons, at their residence and/or at their stash houses and in their automobiles, firearms, including: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons that are used to protect and secure the drug trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records. Courts have recognized that firearms and ammunition are a tool of the drug trafficking trade; that drug traffickers utilize firearms to protect themselves from rip-offs or from their drug related items being stolen and/or seized by law enforcement.

n.   There are many reasons why drug traffickers maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. This evidence is more and more frequently found in electronic format. People conduct

the ordinary affairs of life, whether making travel plans or business arrangements, using computers and electronic devices such as smart phones that operate as computers. The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any computer related evidence. However, that evidence may still be retrievable by a trained forensic computer expert.

o. Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).

p. Drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

q. It is common for drug traffickers to secret contraband, proceeds of drug sales and transactions in secure locations within their residence, including "stash houses," in vehicles, or locations other than their primary residence for ready access and to conceal those items from law enforcement authorities.

r. Drug traffickers keep paraphernalia for manufacturing, packaging, weighing, and distributing controlled substances; that these paraphernalia include, but are not limited to, scales, plastic bags, aluminum foil, paper bindles, zip-lock bags, and other containers used to package and store controlled substances.

8.     This affidavit is submitted for the limited purpose of securing a search warrant for the **SUBJECT PREMISES**, as identified in **Attachment A**.  As such, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities related to the **SUBJECT OFFENSES**, described in **Attachment B**, are located in the place described in **Attachment A**.

9.     The information contained within this affidavit is based on my training and experience, information of which I am personally aware by virtue of my participation in this investigation, my review of investigative reports, and information imparted to me by other law enforcement officers involved in this investigation.  I have spoken with other DEA Special Agents and Task Force Officers about this and other similar cases, and I have spoken with narcotics experts regarding methods of operation utilized by subjects who distribute, manufacture, traffic,

and/or sell controlled substances.  I have also spoken with other DEA Special Agents, Task Force Officers, and Intelligence Analysts regarding the technological devices, tools, and methods used by subjects who cultivate, manufacture, traffic, and/or distribute controlled substances.

10.     Based on the information set forth in this affidavit, there is probable cause to believe violations of the **SUBJECT OFFENSES** have been committed, are being committed, and will be committed by **MILNER**, and others yet unknown, and that concealed in or on the **SUBJECT PREMISES**, identified in **Attachment A,** is evidence of the commission of criminal offense(s); contraband, the fruits of crimes, and things otherwise criminally possessed; and property designed or intended for use or which is or has been used as the means of committing criminal offense(s), including drugs, drug proceeds, and other items used in connection with, or in furtherance of, those offenses.  Accordingly, evidence collected from the **SUBJECT PREMISES** will further an ongoing investigation into **MILNER** and any presently unknown associates involved in the cultivation, manufacture, and distribution of illicit psilocybin mushrooms, a Schedule I Controlled Substance. The evidence to be seized and searched is identified with specificity in **Attachment B** hereto.

## SUMMARY OF CURRENT INVESTIGATION

11.     The United States, by and through the DEA, is currently investigating drug trafficking activity conducted by **MILNER** and other unknown individuals presently unidentified involving violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956.

The Denver Post Article

12.     On August 23, 2019, investigators with DEA Enforcement Group 1 learned of an article in the Denver Post entitled "Spores of psychedelic mushroom industry are sprouting in Denver after decriminalization" dated August 23, 2019, available at the following link on the Denver Post website: (https://www.denverpost.com/2019/08/23/psychedelic-mushrooms-denver-decriminalization/) (the "DP Article").

13.     The DP Article briefly described the growing distribution network of illegal psilocybin mushrooms in the Denver metropolitan area after decriminalization of simple possession of psilocybin mushrooms.  The DP Article focused mainly on an unidentified male subject who is a self-proclaimed cultivator and distributor of mushrooms, who investigators now believe to be **MILNER** for reasons set forth herein. In the DP Article, the male subject explained that he packages the mushrooms in the same canisters and bags as the cannabis industry, complete with his custom logo.  The male subject distributed to a network of about 20 people and earns about $2,000 a month in sales.

14.     The DP Article also featured a video showing the process of cultivating and manufacturing illegal psilocybin mushrooms occurring in the male's residence.  The male subject explained he grows the mushrooms in a cannabis tent that has been repurposed to cultivate

mushrooms.  The video showed the various stages of cultivation, from the initial growth to the finished dried product.  The video explains that the male subject has been growing mushrooms in his apartment for a little over a year.  At numerous points in the video, the male subject can be identified as a white male. The following is a screenshot of a portion of this video:



15.     After viewing the DP Article and the associated video, DEA investigators performed an open source search of media articles regarding the sale of psilocybin mushrooms in Denver, Colorado.

The National Public Radio Article

16.     As a result of this search, investigators located an article on National Public Radio's website entitled "A Growing Push to Loosen Laws around Psilocybin, Treat Mushrooms as Medicine", dated May 7 2019, available at the following link on NPR's website: (https://www.npr.org/sections/health-shots/2019/05/07/720828367/a-growing-push-to-loosen-laws-around-psilocybin-treat-mushrooms-as-medicine) (the "NPR Article").  The subject of the NPR Article is an unidentified male known as "Douglas," who investigators now believe to be **MILNER.**  The NPR Article noted that "Douglas" was the subject's middle name, as the subject wanted to keep his identity a secret.  Investigators note that Douglas is **MILNER's** middle name.  In the NPR Article, "Douglas" discusses his active cultivation, manufacture, and distribution of psilocybin mushrooms, with various quotes used in the article mirroring those from the DP Article.

17.     The NPR Article contained two photographs of "Douglas," neither of which showed the subject's face.  These photographs depict a white male, possibly in his mid-20's, with brown facial hair and a thin build.  The male depicted in these photographs appears to match the male subject of the DP Article.  The photographs also show "Douglas" wearing a white t-shirt on

with a logo for "Happy Fox Edibles."  A screenshot of one of the photographs included with the NPR Article is included below:



The Harvest Public Media Article

18.     During their review of other media articles, investigators also located an article from Harvest Public Media entitled "A Growing Movement Wants to Loosen Laws around Psilocybin, Treat Mushrooms as Medicine" dated April 29, 2019, available at the following link on Harvest Public Media's website: ([https://www.harvestpublicmedia.org/post/growing-movement-wants-loosen-laws-around-psilocybin-treat-mushrooms-medicine](https://www.harvestpublicmedia.org/post/growing-movement-wants-loosen-laws-around-psilocybin-treat-mushrooms-medicine)) (the "Harvest Article").  The Harvest Article appears to be similar to the NPR Article published on May 7, 2019, documenting the illegal cultivation, manufacture, and distribution of psilocybin mushrooms by an unidentified male named "Douglas," who investigators now believe to be **MILNER**.

19.     The Harvest Article contained another photograph of "Douglas," whom investigators believe to be **MILNER**, who has brown hair, wearing the same white t-shirt with the "Happy Fox Edibles" logo.  This male appears to be the same male as depicted in the DP Article video and the NPR Article photographs.  A screenshot of this photograph is included below:



20.    Another photograph shows a pair of hands, presumably the same male whom investigators believe to be **MILNER**, holding suspected psilocybin mushrooms.  The individual appears to be wearing a white t-shirt, shown in the background of the photograph, with the text "EDIBLES," which appears to be the same "Happy Fox Edibles" t-shirt.  A screenshot of this photograph is included below:



The Westword Article

21.     Investigators also located an article from Westword entitled "Psilocybin Dealer on Life After Decriminalization" dated May 15, 2019, available at the following link on Westword's website:  (https://www.westword.com/news/psilocybin-dealer-on-life-after-decriminalization-in-denver-11343681) (the "Westword Article").   The Westword Article documented illegal psilocybin mushroom cultivation, manufacture, and distribution by a subject identified as "Douglas," who investigators now believe to be **MILNER**.

22.     In the Westword Article, "Douglas" discusses his illegal psilocybin mushrooms distribution activities and practices.  "Douglas" states that he does not do cash deals, and uses only electronic transactions in an effort to thwart any kind of law enforcement prosecution if he is caught selling mushrooms to a customer.   "Douglas" also states that he meets customers at locations near, but not at his apartment.  "Douglas" further indicates that he works in the cannabis industry, where he meets most of his customers and uses the sales of psilocybin mushrooms to supplement his income.   "Douglas" also admits that he knows he could get in trouble selling psilocybin mushrooms, so he uses encrypted text messages to talk to his customers.

23.     The Westword Article estimates that "Douglas" produces between a quarter to half pound of dried psilocybin mushrooms every month to month and a half, and $800 per month in proceeds from the sale of the psilocybin mushrooms.  The Westword Article also states that "Douglas" sells psilocybin mushrooms "at a premium," selling an ounce of dried mushrooms for approximately $200, and an eighth of an ounce, a standard dose for a single user, for $30.  The Westword Article further states that "Douglas" also makes chocolate bars or capsules for "microdosing," or use of smaller amounts than an eighth of an ounce.

24.     The Westword Article further states that "Douglas" recently invested in new equipment that can fit more containers for cultivating psilocybin mushrooms, which should enable "Douglas" to produce two pounds of dried psilocybin mushrooms in the same amount of time. "Douglas" is quoted stating: "[a]fter that is fully operation, I could be making $2,000 per month". The Westword Article also contains a photograph of a white male's hand holding psilocybin mushrooms which appears similar to the individual depicted in the previous articles.  A screenshot of this photograph is included below:



25.     The Westword Article also contains a photograph of the cultivation of psilocybin mushrooms, a screenshot of which is included below:



The VICE News Video

26.     Investigators also located a documentary video by VICE News entitled "How Denver Decriminalized Magic Mushrooms" dated May 8, 2019, available on Youtube at the following link: (https://www.youtube.com/watch?v=ftNI7v0gMs4) (the "VICE Video").   The VICE Video  follows a tall white male, approximately 6'2", thin build, brown hair, wearing a white "Happy Fox Edibles" t-shirt, and identified as "Douglas," who investigators believe to be **MILNER.**     This white male, and the "Happy Fox Edibles" t-shirt, appear identical to the

11

individual depicted in the photographs contained with the DP Article, NPR Article, Harvest Article, and Westword Article (collectively, the "Articles").

27.      The VICE Video shows a walk-in tent in the subject's bedroom, near the foot of his bed, where he cultivates psilocybin mushrooms.  While speaking with a reporter, "Douglas" explains that he knows it is illegal to grow and sell psilocybin mushrooms, stating: "It is illegal in every way possible."  Screenshots from the VICE Video are included below:







The "Happy Fox Edible" Logo

28.     DEA Investigators also completed an open source search of Instagram, and located a public Instagram page for the handle "@dillonwheaton".  On June 23, 2019, this Instagram handle posted a picture of the same "Happy Fox Edibles" logo appearing on the t-shirts in the Articles, with the caption "Quick little revamp work on the Happy Fox Edibles logo!"  The logo depicts a drooling fox with extremely dilated pupils, standing in a grass field with mushrooms, some of which appear to have been eaten.  Another photograph posted on the Instagram handle's page on November 17, 2018, shows the "Happy Fox Edibles" logo with the caption "Here's a little graphic logo commission I banged out for Happy Fox Edibles" with a picture of a mushroom and a fox.  A screenshot of the June 23, 2019 posting is included below:



29.     Investigators also discovered that the Instagram page had a PayPal account attached for paypa.me/DillonWheaton from Plainville, CT.

Identification of Kole Douglas Milner on Social Media

30.     After comparing information gleaned from the Articles and the "Happy Fox Edibles" logo posted on the above-referenced Instagram account, investigators were able to locate Kole Douglas **MILNER** using the Colorado Department of Revenue's database and information listing employees in the cannabis industry in the State of Colorado with the middle name "Douglas." Investigators utilized this database based on the information from the Westword Article indicating that "Douglas" works in the cannabis industry in Colorado.

31.     Investigators were then able to locate **MILNER's** public Facebook account, which shows **MILNER** is a white male, approximately 6'2" with brown hair and thin build, matching the physical description of "Douglas" shown in the Articles. The Facebook page contains several posts in support of the decriminalization of psilocybin mushrooms. A screenshot of this public Facebook account is included below:

14



32.     A video posted on **MILNER's** public Facebook profile on March 30, 2019, entitled "SCIENCE," shows the inside of an apartment.  There are numerous posters on the walls in the background.  Of note, certain posters seen in the video in the upper right portion of the screen appear to be the same as those seen in the video accompanying the DP Article, including a tan drawing of a giraffe on the wall and a purple poster stating "Mushrooms Are Medicine Decriminalize Denver."   A screenshot of this Facebook post is included below, along with a screenshot of the same posters shown in the DP Article:



33.    Per **MILNER's** Facebook account, **MILNER** works for a cannabis-related company identified as "Harvest Happens." Investigators located a website for Harvest Happens,

16

which is described as a "Full-Service Cannabis Trimming Company Located in Denver, CO," located at 3340 Youngfield St, Suite 147, Wheat Ridge, CO.

34.     Investigators also located a public Instagram account believed to be used by **MILNER** with the handle @kolemilner.  A picture posted on August 3, 2019, on this Instagram account's page shows two framed pictures in an apartment.  The top framed picture is the "Happy Fox Edibles" logo seen in the Articles and posted on the Instagram page of "@dillonwheaton." The second photograph is the same design as the back of the shirt that is seen in photograph from the Harvest Article.  Other photographs posted by the Instagram account show a male who appears to be the same individual as depicted on the above-referenced "Kevin Matthews" August 27, 2019 Facebook account post with **MILNER**.  As noted below, MILNER's driver's license photograph obtained from the Colorado Department of Motor Vehicles confirms the individual depicted in the photographs is **MILNER**. A screenshot of the public Instagram account and the August 3, 2019 post are included below:



35.     **MILNER**'s Facebook account shows posts from a Facebook account identified as "Dillon Wheaton," believed to be the same subject holding the Instagram handle @dillonwheaton and the designer of the "Happy Fox Edibles" logo.  The profile associated with "Dillon Wheaton" notes that he lives in Plainville, Connecticut, the same location that was stated on the Paypal account paypa.me/DillonWheaton.

36.     **MILNER's** Facebook profile also shows **MILNER** is Facebook friends with an individual identified as "Kevin Matthews."  The public Facebook profile of "Kevin Matthews" shows a Facebook post on August 24, 2019, regarding the DP Article, stating: "I'm so proud of my friend for creating this incredible content with Andy Kenney at The Denver Post."  The author of the DP Article is Andrew Kenney.  A screenshot of this Facebook post is included below:



37.     On August 27, 2019 investigators located a photograph posted on the Facebook account of "Kevin Matthews."  In the picture, the account user tagged himself with **MILNER** and numerous other individuals.  **MILNER** is seen in the picture wearing the same white T-shirt with the "Happy Fox Edibles" logo.  MATTHEWS posted: "It was really ,really good to spend some quality time with my friends, these amazing myconaughts last night! I sure needed it."  From my training, experience, and research, I know that the term myconaughts is associated with the term myconauts, which describes people who have interest in mushrooms.  A screenshot of this posting, including a close-up of **MILNER**, is included below:





Kole Douglas Milner's Venmo Account and Transaction History

38.     As noted above, in the Westword Article, the subject "Douglas," believed to be **MILNER,** explained that he does not use cash transactions for the sales of psilocybin mushrooms. In order to evade law enforcement detection, "Douglas" stated that he utilizes only electronic payments.

39.     Through open source searches, DEA investigators were also able to locate a Venmo account identified to as "Kole-Milner," which investigators believe is operated by **MILNER**. Venmo is a money transfer service operated by PayPal, Inc. I know Venmo to be a quick and efficient means to transfer currency electronically.

40.     On August 28, 2019, investigators issued an administrative subpoena to Venmo to obtain records related to the Venmo account "Kole-Milner."  This information was received from Venmo on August 30, 2019.

41.     Venmo's records do not list the name of the user of the account, instead identifying the user as "Grandfathered User."  However, other information indicates **MILNER** is the user of the account.  The phone number listed for the Venmo account is 720-331-0191.  Through an administrative subpoena, I learned phone number 720-331-0191 was a Sprint phone subscribed to Kole **MILNER**.

42.     Venmo's records also contain the account user's bank account and credit card information for any bank account or credit card linked to the Venmo account.  The bank account associated with the Venmo account is a FirstBank account ending in digits 1303.[1]  Investigators believe that the account holder of this FirstBank account is **MILNER**.

43.     Venmo's records also indicate that the account user's billing zip code is 80246.  As discussed below, a search of law enforcement databases shows that **MILNER** is associated with the address 1275 S. Birch St #203, Denver, Colorado (the **SUBJECT PREMISES** identified in **Attachment A** hereto), the zip code of which is also 80246.  Venmo's records also lists the account user's e-mail address of ("gaiadelix@gmail.com").

44.     Publically-available transactions related to the account "Kole-Milner" further suggest the account is operated by **MILNER**.  On June 23, 2019, a Venmo account user identified as "Dillon Wheaton" charged the account "Kole-Milner" for "Graphics." As noted above, June 23, 2019, is the same date on which the Instagram account "@dillonwheaton," which investigators

---

[1] The complete FirstBank bank account number associated with the account was provided by Venmo pursuant to the administrative subpoena.  I have reviewed the complete account number in preparing this affidavit.  To protect the bank account holder's privacy, the full account number has been omitted from this affidavit.

believe to be associated with Dillon Wheaton of Plainville, CT, posted the picture of the "Happy Fox Edibles" logo with the message "Quick little revamp work on the Happy Fox Edibles logo!"

45.   Other publically-available transactions related to the Venmo account "Kole-Milner" appear to be related to the sale of psilocybin mushrooms.  Screenshots of these transactions are included below:



46.   As depicted above, on May 30, 2019, a Venmo account user identified as "Katie Etcheverry" paid the Venmo account "Kole-Milner," with the subject line: "Magic."  I know, through training and experience involving drug trafficking activities and organizations, a common slang term for illicit psilocybin mushrooms is "magic mushrooms."  Therefore, I believe this is a coded reference to the sale of illicit psilocybin mushrooms.

47.   Information received from Venmo pursuant to the administrative subpoena request reveals that this payment was made in the amount of $90.  This amount is consistent with three, one-eighth of an ounce doses of psilocybin mushrooms, a standard single-user dose, at a price of $30 per dose.  As noted above, in the Westword Article, **MILNER** stated that he charges $30 per one-eighth dose.

21

48.     Additional information received from Venmo pursuant to the administrative subpoena request reveals that on June 11, 2019, after the above-referenced transaction with "Katie Etcheverry" on May 30, 2019, the user "Kole-Milner" "cashed out" the funds in the Venmo account (a term to describe depositing funds from a user's Venmo account into his or her connected bank account), in the amount of $125. This information indicates the funds were withdrawn from the Venmo account and deposited to the FirstBank account believed to be associated with **MILNER**.

49.     As depicted above, on July 24, 2019, a Venmo account user identified as "Katie Brooksbank" paid "Kole-Milner," with the subject line depicting two cartoon mushrooms. Through training and experience, I believe the cartoon mushrooms to be a reference to psilocybin mushrooms.

50.     Information received from Venmo pursuant to the administrative subpoena request reveals that this payment was also in the amount of $90.  This payment is also consistent with three, one-eighth of an ounce doses of psilocybin mushrooms, priced at $30 per dose.

51.     Additional information received from Venmo pursuant to the administrative subpoena request reveals that On July 25, 2019, shortly after the above-referenced payment from "Katie Brooksbank," the user "Kole-Milner" "cashed out" the funds in his Venmo account, in the amount of $110.  This information indicates the funds were withdrawn from the Venmo account and deposited to the FirstBank account believed to be associated with **MILNER**.

52.     Based on this information, there is probable cause to believe that **MILNER** operates the Venmo account identified as "Kole-Milner," and further, that **MILNER** utilizes this Venmo account to receive payment for the sale of psilocybin mushrooms, the proceeds of which are then transferred into a FirstBank account believed to be associated with **MILNER**.

Cryptocurrency Holdings:

53.     On June 20, 2019 **MILNER** posted on his public Facebook account a message that contained the words "BTC" and a picture of an increasing yield graph and an arrow pointing up. I know, through training and experience, that "BTC" is a commonly-used abbreviation for Bitcoin, a cryptocurrency. Under the post, a Facebook user identified as "Priyanshu Kant" commented: "gonna fall at 10k?  **MILNER** responded: "Priyanshu Kant ehh it might I'm contemplating when the peak will be.  Possibly 10k.  I've made $70 so far."  A screenshot of this exchange is included below:



54.   On June 21, 2019 **MILNER** posted a screenshot on his public Facebook account of Bitcoin (Crypto) value increasing with the comment "BTC gainz".  Under the screenshot, a Facebook user identified as "Andrew Frazier" commented: "U have 10$."  **MILNER** responded with the comment: "Andrew Frazier nah, started with like $268, now have $338.  100ish dollars isn't bad, I'll take it."



55.     Bitcoin is a cryptocurrency and worldwide payment system. Bitcoin is the first decentralized digital currency, as the system works without a central bank or single administrator. The network is peer-to-peer, and transactions take place between users directly, without an intermediary. These transactions are verified by network nodes through the use of cryptography and recorded in a public distributed ledger called a blockchain. Every bitcoin transaction that occurs in the entire payment network is recorded on the blockchain.

56.     Individuals store information about their bitcoin in a bitcoin virtual "wallet," which acts as a bitcoin equivalent of a bank account. Bitcoin wallets have a private key and a public key, which is commonly known as the wallet address. Bitcoin wallets are electronic in nature and may be stored on mobile devices, external or removable media, or computers. In addition, individuals conducting business with bitcoins can back-up wallets to paper printouts, which would contain information to restore the wallet into an electronic form. Passwords for access to electronic wallets are typically complex and are often written down or saved in an accessible manner on paper or on some electronic device. The keys are a series of alphanumeric characters that when used together will open a wallet and allow funds to be sent or received and can be provided to individuals who wish to consummate transactions with bitcoin. The public wallet address is recorded on the blockchain when a transaction is processed. A single user can create hundreds of unique bitcoin

addresses attached to a single bitcoin wallet. Bitcoin is pseudonymous, meaning that the digital currency is not tied to an identifiable real-world entity but rather to a bitcoin address. Owners of a bitcoin address are not explicitly identified and new addresses can be generated for every new transaction to increase anonymity.

57.     Individuals have options of what to do with cryptocurrency such as bitcoin. The cryptocurrency can be left in the digital wallet, it can be transferred from that wallet to another digital wallet or application or software used for holding cryptocurrency, or it can be transferred to a peer or an exchange for the conversion of the cryptocurrency to actual, tangible currency such as United States currency. There are also online vendors that accept bitcoin in exchange for the purchase of items, both lawful and unlawful.

58.     The purchase and sale of bitcoin can be conducted either through an online exchange where the transaction occurs with the exchange, or through a peer-to-peer transaction that does not use an established exchanging service as an intermediary. Peer-to-peer transactions can be conducted anonymously from any location with an internet connection, or by individuals meeting in person where the seller sends bitcoin from their digital bitcoin wallet directly to a buyer's bitcoin wallet in exchange for a predetermined amount of fiat currency or other asset.

59.     Individuals conducting business in this manner must use a computer or other electronic device, such as a smartphone, tablet, or computer to conduct transactions involving bitcoin.

60.     Based on my training and experience, I know that individuals engaged in drug trafficking and money laundering offenses use cryptocurrencies, including Bitcoin, to conceal the source of funds, as cryptocurrencies are difficult for law enforcement authorities to track and monitor.  This is consistent with **MILNER**'s statements that he receives payment electronically. Accordingly, there is probable cause to seize and search **MILNER**'s electronic devices in or on the **SUBJECT PREMISES** and other items related to electronic payments and cryptocurrencies, described in greater detail in **Attachment B** hereto, for evidence related to the **SUBJECT OFFENSES** described herein.

The Subject Premises

61.     A Colorado Department of Motor Vehicle query lists Kole Douglas **MILNER** (DOB 12/30/1991) at the address 3240 S. Irving St #302, Englewood, CO.  **MILNER** is listed in these records as 6'05", 200 pounds with brown hair and blue eyes.  This description is consistent with the appearance of the individual known as "Douglas" shown in the Articles and the VICE Video.

62.     A further search of law enforcement databases shows that **MILNER** is also associated with the address of 1275 S. Birch St #203, Denver, CO, 80246, identified herein as the **SUBJECT PREMISES,** with phone numbers 913-499-0188, 720-331-0191 and 405-818-6506.

63.    On August 26, 2019 at approximately 4:30 p.m., I initiated surveillance at the **SUBJECT PREMISES**, believed to be the current residence of **MILNER**.   I entered the apartment complex and located apartment #203 on the second floor, and noted there was a doormat that said "HOME" in front of the front door.  Photographs depicting this area and the door are set forth in **Attachment A** hereto.

64.    A video posted on **MILNER's** public Facebook account on May 20, 2019 shows the parking lot and pool area of an apartment complex.  This apartment complex appears to be the same apartment complex as the **SUBJECT PREMISES**.  During the video, a male voice can be heard stating "it's snowing in May… great".  The voice of the male sounds similar to the male interviewed in the video for the DP Article.

65.    At approximately 4:50 p.m. on August 26, 2019, I exited the south side of the apartment building where the **SUBJECT PREMISES** is located**,** when I saw a 2007 silver Mazda 6 bearing Colorado license plate QLG205, later found to be bearing Vehicle Identification Number 1YVHP80C675M40349, park on the west side of the building.

66.    A Colorado Department of Motor Vehicle query indicates that the 2007 silver Mazda is registered to **MILNER** at the **SUBJECT PREMISES**.  I observed a tall white male with brown hair exit the vehicle and grab a gym bag from the vehicle.  I walked to the second floor of the apartment complex and saw the male walk towards unit #203.  As I passed in the hallway, the male subject looked at me.  At this point, I was able to positively identify the male as **MILNER** based on various social media pictures and a DMV photograph.   **MILNER** then entered the **SUBJECT PREMISES** and immediately locked the door.

67.    On September 4, 2019 at approximately 3:00 p.m. investigators with DEA Enforcement Group 1 established surveillance at the **SUBJECT PREMISES**.  At approximately 4:16 p.m., I saw a silver Mazda 6 bearing Colorado license plate QLG205 park on the west side of the building.  A tall white male wearing a white shirt and grey shorts exited the vehicle and walk toward the building, who I recognized to be **MILNER**.

68.    Based on the location of the apartment, I was able to determine that a back patio on the apartment building belonged to unit 203, the **SUBJECT PREMISES.** I was then able to establish surveillance on the back patio of the **SUBJECT PREMISES.**

69.    At approximately 8:25 p.m., I established foot surveillance across the street from the patio.  As I looked at the patio, I noted an adjacent window, which I believed to be the associated bedroom in the **SUBJECT PREMISES**, was completely blacked out with what appeared to be blackout shades.  It should be noted that in the VICE Video, the male subject can be seen in a bedroom with blackout shades on the window.

70.     At approximately 9:00 p.m., I saw two male subjects on the patio smoking.  I noted that one of the subjects, who I believed to be **MILNER**, was wearing a blue t-shirt. At approximately 10:00 p.m., I saw the same male subject in the blue shirt exit the east doors of the apartment building with a brindle colored dog.  At this time, I was able to positively identify the subject that exited the doors and the one on the patio of #203 to both be **MILNER**.

71.     Based on the foregoing information, there is probable cause to believe that **MILNER** is actively engaged in violations of the **SUBJECT OFFENSES**, including the illicit cultivation, manufacture, possession, and distribution of psilocybin mushrooms, at the **SUBJECT PREMISES**.  Given the length of time between the publication of the Articles, including the Harvest Article in April, the NPR Article and the Westword Article in May, and the DP Article in August, I do not believe that the media attention generated by the articles has caused **MILNER** to cease his activities.  In fact, based on **MILNER**'s statements in the Westword Article and the DP Article, it appears that **MILNER** has steadily increased his capacity to cultivate, manufacture, and distribute psilocybin mushrooms.  Moreover, based on **MILNER**'s social media postings and the above-referenced surveillance, there is probable cause to believe that the **SUBJECT PREMISES** is the apartment depicted in the Articles and the Vice Video, and that **MILNER** actively utilizes the **SUBJECT PREMISES** to commit violations of the **SUBJECT OFFENSES**.

## SEIZURE AND SEARCH OF COMPUTERS

72.     In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

73.     As described herein and in **Attachment B**, I submit that if computers or storage media are found at the **SUBJECT PREMISES**, there is probable cause to search and seize those items for the reasons stated herein. In particular, **MILNER**'s statements regarding his use of electronic payment methods and encrypted communications demonstrates there is probable cause to search and seize these items for evidence and instrumentalities of violations of the **SUBJECT OFFENSES**.

74.     Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. I am aware that modern cellular telephones, or smart phones, operate in many respects as a computer, with internet access, and function at times as a person's computer historically would have.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

27

75.     For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

76.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

77.     Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created

78.     As further described in **Attachment B**, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

79.     The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

80.     The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit the offenses discussed in this affidavit. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

81.     Similarly, information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Here, based on the information set forth above, there is probable cause to believe **MILNER** uses electronic payment methods, including Venmo, and which may also include cryptocurrency, to receive payment for distribution of controlled substances.

82.     User attribution evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

83.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

84.     Searching computer(s) for the evidence described in **Attachment B** may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

85.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, which often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment.  This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

86.     For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

a.  On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

b.  On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted);

c.  On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

87.   The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

a.  The nature of evidence. As noted, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

b.  The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage

media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. <u>Variety of forms of electronic media</u>. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e. <u>Need to review evidence over time and to maintain entirety of evidence</u>. I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in **Attachment B** in order to prevent unnecessary invasion of privacy and overbroad searches. I advise that it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, I and other investigators at DEA have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in **Attachment B**. In order to obtain the full picture and meaning of the data from the information sought in **Attachment A and B** of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

32

88.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching and off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

89.     I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime. The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents. Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

90.     I know from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to commit the crimes described in this affidavit to include credit card bills, utility bills, mail, correspondence, and other identification documents

91.     I know from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include identification documents, bills, and receipts.

92.     When searching the **SUBJECT PREMISES**, Apple brand devices, such as iPad or iPhones, which are ubiquitous, may be found. Touch ID is a feature that recognizes up to five fingerprints designated by the authorized user of the iPhone. A Touch ID sensor, a round button on the iPhone or iPad, can recognize fingerprints. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use

the fingerprints and thumbprints of any device's users to attempt to gain access to any Apple devices found at the Subject Premises while executing the search warrant. The government may not be able to obtain the contents of the Apple devices if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

93.    In addition, I know in my training and experience that many other mobile device manufactures have their own version of Touch ID—that is, a fingerprint recognition feature that the device's user can program and use to unlock the device. For instance, I know that Google Pixel-branded phones have a fingerprint sensor that can be used to unlock the device. Similarly, Samsung, LG, HTC, and other manufacturers also have devices with fingerprint sensors.

94.    Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

95.    Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises to the Touch ID sensor or other device fingerprint sensor of the seized device, to the extent a visual inspection of those devices reveals that the device has a fingerprint sensor—located pursuant to the warrants requested by this Affidavit for the purpose of attempting to unlock the device via Touch ID or other fingerprint sensor in order to search the contents (including applications) as authorized by this warrant.

96.    Furthermore, for the reasons set forth herein, I submit belief that sufficient probable cause has been established to search and seize any online digital currency exchange platform accounts, and the data contained therein. Due to the inherent illicit and anonymous nature of these accounts, and that there is no identified service provider for these accounts, legitimate, compliant or not, to which legal process may be served, I believe this to be the only manner to recover said evidence.

## CONCLUSION

97.    Based on the facts and information set forth herein, there is probable cause to believe **MILNER** and other unknown individuals have committed, are committing, and will commit violations of federal laws including 21 U.S.C. § 841 (manufacture, distribution, and possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy), and 18

U.S.C. § 1956 (money laundering), and that the **SUBJECT PREMISES** contains evidence and instrumentalities related to these violations of federal laws.

98. Therefore, I respectfully request that this Court issue a Search Warrant for the **SUBJECT PREMISES** more fully described in **Attachment A**, to search for evidence and instrumentalities of violations of the **SUBJECT OFFENSES**, listed and identified with particularity in **Attachment B** hereto.

I, Samuel Glynn, a DEA Special Agent, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

*s/Samuel Glynn*
Samuel Glynn, Special Agent
Drug Enforcement Administration

Submitted, attested to, and acknowledged by reliable electronic means on September 10, 2019.

BY THE COURT:

KATHLEEN M. TAFOYA
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Reviewed and submitted by Assistant United States Attorney Conor A. Flanigan.**